Norman CAIRL, Respondent,

v.

CITY OF ST. PAUL, Appellant.

No. 47779.

Supreme Court of Minnesota.

June 23, 1978.

police will continue to so rely because of the absence of judicial action.

Harriet Lansing, City Atty. and Beryl A. Nord, Asst. City Atty., St. Paul, for appellant.

Terrance S. O'Toole, St. Paul, for respondent.

SCOTT, Justice.

These are appeals from a judgment of the Ramsey County Municipal Court in favor of plaintiff, Norman Cairl, and against defendant, City of St. Paul (City), in a tort action arising out of an automobile accident involving a police squad car owned by the City.

The trial court, sitting without a jury, found the City was not negligent; however, it found the City was liable under the doctrine of strict liability and respondeat superior. Judgment was entered in the amount of $1,150, plus costs. Both parties appealed.

The evidence reveals that at approximately 4:30 p. m. on Saturday, March 22, 1975, Andrew Gohl, a St. Paul police officer, was operating a squad car owned by the City. Accompanying Officer Gohl was his partner, Officer William Duff. At the corner of Margaret Street and Seventh Street in St. Paul, Officer Gohl began to follow a brown 1964 Chevrolet that was headed west on Seventh Street because a car of that description had been reported stolen. Officer Gohl turned on the red lights of the squad car in an attempt to stop the Chevrolet. The driver failed to stop, and the officers activated their siren.

The Chevrolet then turned left onto southbound Maria Avenue and accelerated rapidly to a speed of 70 to 75 miles per hour. Upon reaching Old Hudson Road, it turned left again and accelerated to a speed of 70 to 80 miles per hour. The squad car pursued the Chevrolet at the same rate of speed at a distance sometimes as close as one car length. The distance, however, varied because the Chevrolet at times pulled away from the pursuing squad car.

At the four-way-stop intersection at Earl Street and Old Hudson Road, the Chevrolet

did not stop. It collided with a southbound automobile and went out of control, striking several cars which were parked legally. The squad car was approximately 75 to 100 feet behind the Chevrolet at this point. The Chevrolet finally struck the back end of plaintiff's vehicle, which was parked legally on Old Hudson Road. Officer Gohl, knowing it was a busy intersection, began to apply his brakes prior to entering the intersection, slowing the squad car down to 70 miles per hour. The squad car, upon entering the intersection, swerved into the westbound lane while traveling eastbound in order to avoid the out-of-control Chevrolet but then immediately returned to the eastbound lane to avoid a head-on collision with a car full of people. The squad car, after returning to the eastbound lane, collided with plaintiff's vehicle which had been pushed partially into the traffic lane when the Chevrolet collided with it. The two officers testified that the collision with plaintiff's vehicle could not have been avoided. Both further testified that the squad car could have passed between the vehicles in the area, without an accident, if plaintiff's vehicle had not been pushed into the traffic lane by the Chevrolet.

At the time of impact with plaintiff's car, the squad car was traveling at only 10 to 15 miles per hour. The squad car was slightly damaged in the right front area, and plaintiff's car was hit by the squad car in the left front area. Plaintiff's car was also damaged in the left rear area, presumably by the Chevrolet. There were no personal injuries.

Immediately after the accident, Officers Duff and Gohl apprehended the driver and passenger of the Chevrolet.

Two issues are presented in this case:

(1) Whether the trial court erred in applying the doctrine of strict liability; and

(2) Whether the evidence supports the trial court's finding of no negligence on the part of the police officer driving the squad car.

1. The trial court stated its holding and its rationale for applying the doctrine of strict liability, in situations involving high-speed police chases, as follows:

"The rule which would appear most just is one which courts increasingly apply to enterprises which are inherently dangerous to life or property: The rule of strict liability without fault. See, e. g., *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963); *McCormick v. Hankscraft Co.,* 278 Minn. 322, 154 N.W.2d 488 (1967).

"Applying the rule of strict liability to police chases would mean that

—Innocent people injured by high-speed police chases would be able to collect damages without the court having to find the police had done anything wrong;

—The cost of high-speed chases would be 'internalized,' so that the burden of their use would be borne by the public which allegedly benefits by their use;

—The increased costs of high-speed police chases under strict liability would induce the authorities to use less violent methods of apprehending criminal and traffic offenders, or at least to make conscious choices whether a given chase is worth the risk.

"Strict liability is not absolute liability. The defense of assumption of risk would still be available. [See, e. g., Restatement, Torts 2d, § 402A.] The rule of strict liability need not apply for the benefit of the fleeing offender.

"The rule of strict liability certainly ought to apply however, to suits by innocent bystanders. If police employed by the community chase people at high speeds through city streets, the community ought, in justice, to bear the risk of injury to the innocent.

"The precise holding of the court herein is that

"(a) High-speed automotive chases by police are instrumentalities inherently dangerous to life and property as the term is generally understood at law; and

"(b) Where police in a motor vehicle chase a suspect in a motor vehicle, on a

public highway, at speeds substantially in excess of the lawful limit, and a collision occurs which would not have occurred but for the chase, the political subdivision which employs the police is liable in tort to third parties who suffer injury, without proof of negligence, under the applicable principles of the law of strict liability."

While we may agree with the concern of the trial court, we do not agree that this is the correct legal solution.[1] *Greenman v. Yuba Power Products, Inc. supra, McCormick v. Hankscraft Co. supra,* and Restatement, Torts 2d, § 402A, of course, are not directly applicable since those authorities deal with strict liability in cases involving defective products, an area vastly different from the one presented here.

Plaintiff contends that the trial court's holding can be sustained under the doctrine of ultrahazardous activities. Restatement, Torts, § 520, provides as follows:

> "An activity is ultrahazardous if it
>
> "(a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and
>
> "(b) is not a matter of common usage."

Restatement, Torts, § 519, imposes the following liability for injuries resulting from engaging in ultrahazardous activities:

> " * * * [O]ne who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent the harm."

The only case cited by plaintiff to support the application of the doctrine of ultrahazardous activities in the present situation is *Luthringer v. Moore,* 31 Cal.2d 489, 190 P.2d 1 (1948), which involved the use of hydrocyanic-acid gas during the commercial fumigation of a building. The court there pointed out in dictum that—

" * * * automobiles have come into such general use that their operation is a matter of common usage. * * * However, the use of an automotive vehicle of such size and weight as to be incapable of safe control * * * is not as yet a usual means of transportation and, therefore, the use of such an automobile is ultrahazardous." 31 Cal.2d 498, 190 P.2d 7.

This passage, however, taken from Restatement, Torts, § 520, *comment e,* is in reference to an enormous automotive vehicle whose size and weight could crush water and gas mains under a highway. Furthermore, Restatement, Torts, § 521, which is cited in *Luthringer,* provides that the doctrine of ultrahazardous activities "does not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee * * *." A similar exclusion is contained in the Restatement, Torts 2d, § 521, with respect to the doctrine of abnormally dangerous activities. Since it is the public duty of police officers to pursue offenders, the doctrine of ultrahazardous activities appears to be inapplicable. See, *State v. Valstad,* 282 Minn. 301, 311, 165 N.W.2d 19, 25 (1969). In short, the plaintiff and the trial court have cited no legal authority which compels this court to impose strict liability in situations involving high-speed pursuits by police officers.

The City contends that the negligence standard of care has been applied in every reported case dealing with liability arising out of collisions involving police cars in high-speed chases. E. g., *Sparks v. City of Compton,* 64 Cal.App.3d 592, 134 Cal.Rptr. 684 (1976); *Kirshenbaum v. City of Chicago,* 43 Ill.App.3d 529, 357 N.E.2d 571 (1976); *Ponville v. Travelers Ins. Co.* 340 So.2d 331 (La.App.1976); *Mason v. Bitton,* 85 Wash.2d 321, 534 P.2d 1360 (1975); *Scogin v. Nugen,* 204 Kan. 568, 464 P.2d 166 (1970). In Minnesota, we have always held that liability arising out of the operation of emergency

---

1. Minn.St. c. 299B (Crime Victims Reparations Act) is one approach to this dilemma. The Act, however, presently does not compensate victims for damage to property.

vehicles is predicated upon negligence. See, e. g., *Romero v. City of Richfield,* Minn., 253 N.W.2d 152.(1977); *Van Tassell v. Hillerns,* Minn., 248 N.W.2d 313 (1976); *Edberg v. Johnson,* 149 Minn. 395, 184 N.W. 12 (1921).

Furthermore, the City argues that public policy considerations militate against applying the doctrine of strict liability, quoting *Wrubel v. State,* 11 Misc.2d 878, 880, 174 N.Y.S.2d 687, 689 (Ct.Cl.1958), as follows:

"Claimants' predication of liability on the State is founded on the novel position that the trooper, in attempting to halt one increasing the danger on the highway, did by his attempt alone increase the danger himself. To extend this position to the ultimate would require a police officer to pursue, at an otherwise lawful rate of speed, a lawbreaker traveling at an unlawful rate of speed, or to ignore him in the first place.

"An operator who is speeding, or who is a reckless driver on the highway, would know that all he had to do was to go faster—and under claimànts' theory escape would be possible—there would be no chase. A burglar, bank robber or any other felon could threaten to shoot and under claimants' theory escape would be possible and arrest avoided. * * *."

Plaintiff urges this court to apply the doctrine of strict liability on the bases of the same public policy considerations mentioned by the trial court. While it is true that courts have played a major role in the expansion of the doctrine of strict liability, we feel constrained because of the uncertain ramifications and questionable extent of invoking strict liability. The legislature has already addressed this issue. Minn.St. 169.17 provides: [2]

"The speed limitations set forth in sections 169.14 to 169.17 do not apply to authorized emergency vehicles when responding to emergency calls, but the drivers thereof shall sound audible signal by siren and display at least one lighted red light to the front. *This provision does not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of persons using the street, nor does it protect the driver of an authorized emergency vehicle from the consequence of a reckless disregard of the safety of others."* (Italics supplied.)

Minn.St. 169.20, subd. 5, further provides:

"Upon the immediate approach of an authorized emergency vehicle equipped with at least one lighted lamp exhibiting red light visible under normal atmospheric conditions from a distance of 500 feet to the front of such vehicle and, except where otherwise not required by law, when the driver is giving audible signal by siren, the driver of each other vehicle shall yield the right of way and shall immediately drive to a position parallel to and as close as possible to the right-hand edge or curb of the highway clear of any intersection, and shall stop and remain in this position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer. * * *

* * * * * *

*"This subdivision shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of persons using the highways."* (Italics supplied.)

These statutory provisions impose the negligence standard of care on police officers when operating their vehicles in emergency situations. Although the statutes do not expressly state that police officers and the municipality which employs them are not liable under the doctrine of strict liability, the statutes must be construed as excluding the applicability of strict liability under the well-established rule of statutory construction that "the expression of one thing is the exclusion of another." E. g., *Tynan v. KSTP, Inc.* 247 Minn. 168, 77 N.W.2d 200 (1956). See, also, Minn.St. 645.19. Consequently, by express-

---

2. The phrase "authorized emergency vehicle" used in these provisions includes "a publicly owned police vehicle." Minn.St. 169.01, subd. 5(2).

ly authorizing a negligence action in situations such as this, the legislature has impliedly excluded actions based on theories other than negligence—such as strict liability.

Since the legislature has already spoken, any future attempt to impose strict liability upon municipalities for accidents arising out of high-speed police chases should properly be addressed to that body. As this court stated in *Schumann v. McGinn*, 307 Minn. 446, 467, 240 N.W.2d 525, 537 (1976): "It is in the legislative forum that * * * the law-enforcement policies of this state may be fully debated and determined." The legislature has now responded to that case, which involved the use of a weapon by a police officer.[3] The trial court erred in applying the doctrine of strict liability, and this case therefore is reversed on that ground.

2. In his appeal, plaintiff contends that the trial court's finding of no negligence on the part of the police officers is not supported by the evidence. In cases tried by the court without a jury, this court will not set aside a trial judge's finding unless it is clearly erroneous. Rule 52.01, Rules of Civil Procedure.

A review of the record shows that under present law there was ample evidence that the accident was not caused by the negligence of Officer Gohl. Although Officer Gohl initially pursued the Chevrolet at high speeds, he maintained enough control over his vehicle that he was able to weave through the traffic to avoid hitting an oncoming car and slowed the vehicle down to a speed of 10 to 15 miles per hour at the time of impact. There is uncontroverted evidence that the squad car would not have collided with any vehicle if plaintiff's vehicle had not been pushed into the street by the Chevrolet which was being pursued. The evidence thus supports the trial court's finding of no negligence.

The trial court is therefore reversed as to the first issue and affirmed as to the second.

OTIS, J., took no part in the consideration or decision of this case.

---

3. See, *Schumann v. City of St. Paul*, Minn., 268 N.W.2d 903 (filed herewith); L.1978, c. 736 (effective August 1, 1978).